We'd just like to mention, if any students have questions, we're happy to answer them as well. All right. All right. So we'll proceed to hear argument in the next case on the calendar for argument, which is twenty four to six, six, six, eight. Brian, right. This is Gerardo Talamantes and Dale Woolwich here first from Mr. Moore. Good morning, Your Honors. It please the court. Counsel, my name is Michael Garth Moore. It's my privilege today to speak on behalf of Brian Wright and his son Luke in this very important case. Luke, of course, is a pseudonym. Brian's child's name remains secure. I wish to reserve two minutes for rebuttal time. With regard to Dr. Woolridge. Dispositive of this appeal is one presumption, two concessions and two failures of Dr. Woolridge to meet his burden of proof. The first concession by Dr. Woolridge is that when he undertook on the afternoon of December 16th, 2020. To take six year old boy into an examination room at the behest of counsel. And I understand your point, but can you answer this under Wallace versus Spencer man versus county of San Diego? We said that a forensic medical exam without parental consent, a court order or exit or exit of the exigency violates the fourth and the 14th Amendment. What more do we need to conclude that Dr. Woolridge conduct violated clearly established law if we found that? What more do you need? What more do we need? From our position, Your Honor, you need you need nothing else. And the reason I say that is this. That once this court concludes, because Dr. Woolridge concedes it, that he was a state actor. Did either of those cases hold the doctor liable? In neither of those cases did that issue come before the court, Your Honor. In Wallace, the doctor who was originally a defendant was dismissed under a state law claim. That never arrived at the court of appeals under what it says in the dissent. It says, doctor, you know, in Wallace, it says Dr. Spencer was dismissed from the case on immunity grounds. But there's no explanation. It was state all state law immunity. Your Honor, I have read the decision. There was no federal decision made. So when that's not a reference to qualify, it is not. It is not. So the presumption arises once a private party state actor exists. That qualified immunity is not available to that state actor. Can I direct your attention to May versus San Bernardino County Department of Public Social Services? That case talks about the issue of immunity not depending on the official's title or agency. So can we look to that case to answer the question that I think that you just addressed, which is, does it matter in these other cases that they weren't doctors, that in the Mann case, in the Wallace case, that the identity of the individual at issue wasn't a physician? It does not matter, Your Honor. But the May position is arrived at only after the court determines that the doctor can actually set up a qualified immunity defense. Our position is very simple, and the law is very clear. The doctor cannot set up a qualified immunity defense in this case. The reason I say that in talking about the presumptions here is I turn back to Wyatt versus Cole, which is the touchstone of your brother and sister judge's decision in Jensen. And Wyatt held, and I read from the decision, we have accorded certain governmental officials qualified immunity from suit if the tradition of immunity was so firmly rooted in the common law and was supported by such strong policy reasons that Congress would have specifically so provided had it wished to abolish the immunity. That still goes to the nature of the function that the person is performing. We need to reach a categorical rule with respect to physicians being able to assert qualified immunity or not. We can look simply to the function that they're performing, right? Well, Your Honor, to continue briefly, Dr. Woolbridge cannot set up qualified immunity to reach the May consideration, but I will address that in a moment because the law across the nation is that qualified immunity, any immunity, did not exist for doctors performing state functions as of 1871 when Section 1983 came into effect. Dr. Woolbridge is obligated to prove to this Court as a first instance that there was such an immunity and there was not. And I refer to McMullen, the Sixth Circuit case, which is overwhelmingly the case on point here. The second point is this. Dr. Woolbridge's failure of proof not only goes to the first instance here, but also goes to the question of whether or not he can argue, as he has entirely in this case, the existence of some public policy basis for this Court to create a qualified immunity that did not exist. Dr. Woolbridge's arguments have entirely been based on public policy, completely divorced from the Court's decisions and also untethered to the Constitution. But in Richardson, the Supreme Court quoted Tower v. Glover. And Tower v. Glover stated, and I quote, We do not have a license to establish immunities from Section 1983 actions in the interest of what we judge to be sound public policy. That is exactly what Dr. Woolbridge has invited this Court to do. Can I ask you to turn just for a second to Telemontes? Because you contend that Telemontes misrepresented facts to the juvenile court. Can you pinpoint what specific falsehoods you contend that or omissions were dispositive? Certainly. First, the contention immediately, both in the application for the court-authorized removal and in the dependency petition was that Erlonda Wright had repeatedly, regularly beat her child with her hand, with a belt and with a Hot Wheels track. That was attributed to the child's representations. But if this Court looks at the Child Safety and Risk Assessment, which is the only document created by Telemontes at the time, the Court will find that on the 28th of December of 2020, before he sought the application, Telemontes made notes as to what the child actually said. If the Court goes back, and that's Exhibit 25, that's in the excerpts of record, if the Court goes back, it will find that Telemontes wrote down what the child said and it had nothing to do with the mother supposedly regularly beating the child with her hand, with a belt or with Hot Wheels. The other aspect of this, and the key one, is that Telemontes, in both instances, stated to the Court that this child presented on December 16, 2020, with serious physical injuries and severe harm. So let me ask you about that. The form lists 22 pre-written checkboxes. There are options that need to be checked. So can checking a box rise to the level of misrepresentation that's necessary to support your judicial decision? Actually, Your Honor, my argument here is not based on the temporary custody notice that you referred to. My argument here is based upon the application that was submitted to the Court, Paragraph 6, in which he said this child had suffered serious or severe harm from deliberate action of the mother, which the father approved of and allowed to continue. That was a falsehood. It was a falsehood because Telemontes had seen the images of this child taken by the father less than 24 hours after these events and there was absolutely no serious injury, in fact, almost imperceptible marks on the child, which the father had testified and which the investigating detective had concluded were caused by roughhousing among the children. And is your contention that at least there's an issue of fact there that would allow you to raise that? Oh, absolutely, Your Honor, absolutely. These are questions which must be decided by a jury, must be decided by. For example, the trial court addressed these issues, and in each instance where there was a dispute of fact, the trial court accepted Telemontes' version of that. For example, the trial court found that Telemontes could have found that the injuries were serious or severe based upon Dr. Woolridge's report. However, Dr. Woolridge's report said nothing about severity of these injuries. It only said there are certain injuries here that I have found. The trial court ignored the testimony and the evidence of exactly what injuries existed on this child that Telemontes admitted he had seen and therefore said, well, that's not material, but also even if, the trial court said, even if he is, how do I want to say this, even if he has enhanced what these injuries were, there's no evidence that he did this deliberately. These are all jury issues to be decided. You ask other issues and a key one, Your Honor, which takes us into Scanlon, Costanich, and the Benavides decision, Judge Collins, you were on that court, the Benavides decision, and that is Telemontes in both instances reported to the court that Brian Wright conceded that at least one bruise on the child could have been caused by Orlando spanking the child. Brian Wright contests that and says that's untrue, that's a lie, he never said that. But when you take this together, Your Honor, totality of circumstances, when you take these together, you take the mother regularly beating the child, the child appearing with severe injuries, and then the father, who is the legal father, and Brian is with us today, the father who is the legal father admitting that the mother did this, that, Your Honor, takes us into Scanlon and is directly on point with Scanlon in terms of, I apologize. What I want to do is go back to Benavides and its citation to Green v. Camreta. Proof in the form of an affidavit and deposition testimony that a defendant included false statements in his affidavit requesting protective custody order was sufficient to present a genuine issue of material fact and require the case to go to a jury and deny summary judgment. That, Your Honor, is the key here. My final point with regard to Dr. Woolridge, this Court is not at liberty to frame a new qualified immunity for doctors that did not exist and has not ever existed. But more importantly, even if this Court concluded that Dr. Woolridge could set up a qualified immunity defense, he cannot get qualified immunity in this case. And the reason is, goes back, for example, to Benavides. We talked about this a little earlier in the case. Because in Benavides, the, thank you, in Benavides, the social workers had received qualified immunity at the district court level on the basis of the medical exam that was performed on the child. And this Court, when it took that up, denied that qualified, reversed that qualified immunity. What the district court had said, had accepted, was the defendant's position that Wallace and Mann say nothing about a constitutional right to notice from a particular individual or notice in a particular form. That was Lisk and Jensen's argument, accepted by the district court. And good faith basis to believe that the parents had been notified by someone else. That violation, they claimed, was not clearly established because of that. And this Court said, no, you're wrong. And if we go to Ellis, the Ellis line of cases, the same thing. I thank you very much, Your Honor. Thank you. Thank you, counsel. We'll hear now first from Ms. Rethemeier. Did I pronounce that correctly? Yes, perfectly. All right. And you're representing Telemontes. May it please the Court? My name is Jennifer Rethemeier, and I represent defendants, appellees, Jarder Telemontes and Megan Francisco. I'm reserving half of the time allowed for Mr. Slutz, who will be arguing on behalf of his client, defendant appellee Dr. Woolridge. I'd like to simply go ahead and take appellant's comments in turn. The first was regarding the use of the word regularly, and as appellant put it, beat the child, which was of course nowhere in the documents. The place to find that information is in the forensic interview. The child repeatedly told the forensic interviewer that his stepmother hit him, that it was with an open hand, a belt, and also a Hot Wheels track. It's important to keep in mind here, too, that the child was six years old at the time, and so sequence and exact dates are difficult sometimes for a child of that age to recall. But it's very clearly in the record. I'll refrain from quoting it, but if you'd like to look at it, it's 2 ER 259 to 260. Regarding serious physical injuries in paragraph 6 of the application, I have the application right here. Paragraph 6 does not use that word. The word serious is not there. Why? Because that's not part of the legal standard here. So the legal standard, meaning what Mr. Talamant is needed probable cause of, is in ARS 8-821B, and it does not require that an injury be serious. Instead, it is that there is abuse or neglect, and that it's contrary to the child's welfare to remain in the home. So what's there does not use the word serious, because serious is not required. Does the McKibbin County Protocols for Child Abuse Investigations define serious injury? I don't recall offhand. Okay. Would you agree that the description or at least Talamant's consideration or determination with respect to what constitutes a serious injury should comport with the Pima County Protocols? Should perhaps, but to this legal standard here for probable cause is of abuse or neglect. And here, when speaking of the injury, I do think it's also important to note that it's not just the bruises. Nowhere does appellant account for the emotional impact to the child of being hit by his stepmother. And it comes through particularly in the DCS hotline call from the school health care worker, because it wasn't just that she called over a bruise. She had seen many bruises on this child. It's right in the record of what she reported on the hotline, that she had seen other bruises, asked the child about them, and the child would usually laugh and say how he got the bruise, like from falling or playing. This was different. The child instead deflected, didn't act as he normally does, put his hoodie over his head and stated that he did not get the bruise from falling. So when talking about injury, I think it's important to account for this. It's not just the physical from the bruises. It's also the emotional impact. And to remove a child, DCS does not have to show that the injury is serious under 8-818. Regarding this statement next, this is that Mr. Wright conceded that there could have been a causal relationship between Ms. Wright's hitting and some of the bruises. I think that word could makes this statement immaterial as a matter of law. Mr. Wright concedes that Ms. Wright hit the child the night before the bruise in question. From that, Upwork can simply infer that there could be, which is the words here, that same relationship, that the hitting caused the bruise. So whether or not Mr. Wright said those particular words is immaterial here. More generally, looking at this, to maintain claims for judicial deception... Can I just ask one question just to make sure I'm understanding the facts correctly? When there was the characterization of serious or severe harm, was it clear from the context in which that statement was made in the application that that refers only to the December 16th incident? Or could the context have suggested it referred to something else? So again, the word serious does not appear in paragraph 6 of the application. That said, I do think that the hotline call from that day is what precipitated all of this, and there wasn't any later injury that was identified. So I think for those purposes, if we're talking about did it relate to the state of the child and his injuries on that date, I think yes. Are you saying the application didn't include an assertion that it was serious? So I did not reread the entire thing? I'm looking at ER 660, and this is the ex parte removal application. And I'll read it to you. Quote, L.A.W. is at unreasonable risk of harm at his current home as the parent, guardian, or custodian deliberately harmed him and has caused serious or severe harm. So appellant, when in his argument, had cited paragraph 6, and the word is not there. I apologize. I'm asking you about what is in the application, which I just read, and I want to understand what that means, and I want your input as to what that means. So I don't care whether it's in paragraph 6 or paragraph 28. What does that mean? What is that referring to? Is it referring just to the December 16th incident or observations, or is it referring to something else, or could it be construed as referring to something else? So because there were injuries, meaning bruises, in different states of healing, indicating that they occurred at different points in time, there was concern that there was a pattern here. So in that sense, it refers in that way to more than just that particular date. So I think the reason that I'm asking about, in order for Mr. Talamantis to make an application to the court, ex parte, and make these representations, they need to be informed by experienced protocols. And I'm really interested in the protocols because it's very clear, and I'm looking at ER 530 now, that serious physical injury is defined as a reasonable risk of death or serious impairment of health or something that causes serious or permanent disfigurement or loss or protracted impairment of the function of any bodily limb or organ. And what we're needing to decide here is whether or not there's something sufficient to create a triable issue of fact to go to a jury. And so it may be that Mr. Talamantis is taking all the information and putting this in an application, but couldn't a reasonable trier of fact conclude otherwise, given that Dr. Woolridge's notes say that this is consistent with accidental play, that there are, quote, unquote, little boy bruises consistent with his age? So tell me why this together doesn't at least create a triable issue of fact. So the first reason is that this is a conclusion, and all the facts are set out in advance of that. And this is exactly why we have the court.  That it's a serious injury and that removal is warranted. It's a representation on which Talamantis is asking the court to order the removal of a child. So we have here, in particular, a direct report to Dr. Woolridge's report, which states that given that there are different dates of injury and, of course, the location of them, that this is concerning for the wounds being inflicted. I will also note that the location is important. This is not a scraped knee and a bloody elbow. These are all in the location where spanking occurs. They're all on the rear end and the upper back of the leg. I have to tell you, that argument you're making is very concerning to me. As a person with children, you know, kids get bruises all the time. So these are bruises. So I know you're saying it's not a scraped knee, but it's a bruise. So I really want to understand how that, the bruise, is what can be converted into a statement about serious or severe harm. So the bruise was unexplained and the child was not willing to account for it, which was unlike the child's normal behavior. So this is an indication that there's something going on at the home. Just based upon what you just said, doesn't that create an issue of fact? Oh, it's based upon, that's not what's normal for the child. What's that based on? Well, the interactions between the teacher and the child. So we maybe need to let a trier fact figure that out, don't we? No, for the reason that undisputed facts here support probable cause. We have that Mr. Wright admits that there was spanking at the home, and in fact that it occurred the day before the bruise in question. We also have the bruises themselves and Dr. Woolridge's opinion. Can I just ask you one final question? There was an agreement at some point to return the child to the home. I think that there was actual dismissal of the dependency by DCS. So can you just tell me factually what happened that caused DCS to ultimately dismiss the dependency proceeding or to not pursue that any further? So there could be two different points in time that you're talking about. So the child was not immediately removed. There was a present danger plan in place, and it was only when the parents failed to follow that that the dependency proceedings ensued. The other point in time that you may be talking about is simply the dismissal of the full dependency proceedings. That's because the parents participated in family reunification services, so things like therapy and such, and happily the family has reunified in this case. All right. Thank you, counsel. We've taken you over your time. We'll hear now from Mr. Sloots. Please. Please, the court. My name is Tom Sloots. I represent Dr. Woolridge, and as you know, Judge Zips dismissed him from the case below because of qualified immunity. I agree that there are two issues to decide if that applies. One, is he eligible under the cases, and B, and two, is he entitled to it? So Mr. Moore was attacking the eligibility part, pretty much, saying no doctor has ever been given that, and of course that's not exactly accurate. We have cited numerous cases to you in which we have health care providers of all ilk being granted Is he a government employee? No, he was not. He is a private pediatrician who worked most of his time at Banner Hospital in Tucson in the emergency department. He's a pediatrician, and he spends also some time teaching medical students and residents. What do we do with the concession, I think, as your friend on the other side calls it, but at least the representation from Dr. Woolridge that he was acting under color of state law? I'm sorry, did you ask me if he was acting under color of state law? No, what do we do with his own statements that he was acting in the direction of law enforcement and conducting the medical? Yeah, I think, I mean, you know, that's the issue that we, when it was brought up in the trial court, we said it's probably a question of fact, but we don't need to worry about that. We can accept the fact that he was acting as a state actor and therefore could be liable for a constitutional violation if without any defenses. We're not really arguing that issue. I mean, we won the case beside it. No, but if he weren't acting under color of state law, how would he have any colorable claim as a private citizen to qualified immunity? Why would he? How would he? Well, because if he's a state actor, no, a state actor means that he's acting on behalf of a governmental facility, in my opinion, and those are the people who get qualified immunity. If you're not a state actor, you're not liable for constitutional violations and you don't need immunity. So this is a case where he is working with law enforcement under the Pima County protocols to help stamp out child abuse, is what it was. I mean, and what he does, he worked part-time over at the Children's Advocacy Center doing medical exams, and there were, as we described, they were visual exams to see if there was any evidence of abuse, meaning physical abuse. There are also cases where there's a claim of perhaps sexual abuse, but that wasn't this case, so there's no need to do an evasive examination. But my understanding is that the medical examination includes, the forensic medical examination includes the genital anal exam, correct? I'm sorry, I couldn't quite hear that. The medical exam includes the genital anal exam. It just wasn't done. In fact, there was an attempt to do that here. It wasn't done because the child resisted. Yeah, he didn't do it. I mean, there was no... No, he didn't do it because the child resisted. He was attempting to do it, correct? He was, yes, because I... And the reason I'm asking this question, because I take your point, which is there were no allegations of sexual assault here, but the medical exam that's conducted without notice to the parents or a court order includes this type of exam that is... It's a standard part to at least, as he said in his deposition, spread the buttocks and look at the anus. That's what he said. He didn't do that, though. I haven't had any allegation of sexual assault. This is part of the exam. No, it's part of the... But it's still a visual exam to look to see if there's any bruises because if you're worried about the child being hit with an object, then you want to check all parts of the body, including that. What do we make of the form that was provided? It almost seemed like a purported authorization, but the doctor writes no guardian present on that. What do we make of that? This is the interesting part of it, is because, as you know, the detective who picked up the child from school upon the concerns of the school nurse and the teacher called himself the guardian and signed him into the CAC as the legal guardian for the child. Now, when it came to time to take a medical history, Dr. Woolridge said, I can't do a medical history because there's no guardian present, meaning there's no parent present. But, you know, under his thinking, under what he knows under the Pima County protocols and the statutes of the state of Arizona, he believes that these police officers should pick up children who are perhaps victims of abuse and bring them to him so he can do a physical examination on them. That he would, and that any issues of consent or that kind of stuff are stuff in the area of the medical, of the police officer. He knew he was conducting the examination without any authorization from someone acting as a guardian. I'm sorry, did you say could he do that? He knew that he was conducting the examination without the authorization of anyone acting in the capacity of a guardian. No, he thought under the state statute, which gives the right, in fact the duty, to a police officer to pick up a child and perhaps bring him to an examination, that that gives the, I mean, Dr. Woolridge. My question was yes, that he knew that he was performing the examination without the authorization of a guardian. If you're talking about a legal guardian appointed by the court, sure. But under the system that was working at that time, the statute says that the police officer will do an investigation. How could a reasonable doctor who knows the law and knows what we've said about conducting examinations of children without the parents being notified or consenting is not permitted? How could a reasonable doctor in that position believe that it was permissible to go ahead and do the examination? Because the statute authorizes it. The statute, the whole Pima County protocols talk about the police officer picking up the child and bringing him to a medical examination, for an examination. This is, the rule I described, which we've said in the Wallace case in particular, is a constitutional rule. So how could anyone think that, given that rule that we described in Wallace, that you can proceed to do it without parental contact? I'm not sure that Dr. Woolridge had read the Wallace case or the Mann case. As you stand before us today, you're not arguing that a state statute trumps these cases. No, we're not arguing that at all. But does he know that? And the point is, when he went into the second issue... Well, his objectives, it's an objective test for qualified immunity. Absolutely. Any reasonable officer or doctor in his position, knowing the law, would recognize that what he's doing is unlawful. No. I mean, I think, certainly he wouldn't. He would think that what he's doing is lawful. Because he is doing, he is following the protocols, he is following the Arizona statute. He doesn't know that the Arizona statute doesn't trump violations of the U.S. Constitution. But it's been for years they've been working this way, where he is called over from Banner to do an examination. A police officer shows up with a child. He does the exam. He writes a report. And then he leaves. That's his involvement. Whether the police officer has gotten consent of the parents or a court order is not in his ballpark. What's frightening to me about what you're saying is that a police officer shows up, asks where's the guardian, and the officer says, oh, I guess I'm the guardian. There you go. Go conduct your full examination. Is that what you're saying? That's, well, remember the police officer signs off as the guardian. Dr. Woolridge sees that, and knowing that's the system, the way it's been working over for some years without objection. I thought you said in the answer to the question before that Dr. Woolridge did not think he was acting with the consent of anyone, acting as a guardian. And that's why he wrote, no guardian present. No, that's not why he wrote that. He wrote that with regard to filling out the portion of the medical history, that he couldn't fill it out because there was no guardian present, and that there's no somebody who has a normal aspect over the child to ask a question of. But to do the examination, the examination was authorized. I think that's right, sir. I'm looking at the authorization to perform forensic medical examination, and Detective Johnston signed there guardian. Right. On the same form, Dr. Woolridge noted no guardian present. Yes, but if you look, it's down by the medical history portion. It may not be a big distinction, but the point is that Dr. Woolridge has been doing these exams and has had other physicians at the SACAC been doing these exams under these same conditions. He had no reason to think that that was improper. I have one final question, and I know you're out of time, and you're on borrowed time from Judge Collins now, but I will just get in this last question. You would agree that there was no exigency in this? I agree with you. It's not an exigency thing. All right. All right. Thank you, counsel. All right. Thank you, Your Honor. I'll let you go over your time, and we'll hear rebuttal now. Thank you, Your Honors. To return to Judge Desai's question and to your question, Judge Collins, I asked the court to look back at Mann because in Mann the children were already in the custody, the legal custody of the state at the time these medical examinations were conducted, and the court concluded that was irrelevant. The parent who has permanent responsibility and permanent custody of the child must be notified and must give consent in addition to a court order. You can't get a court order and not notify the parent. You still have to notify the parent and give that parent the opportunity to consent to your child being subjected to an anal examination. Finally, to return to my colleague the Attorney General's statements regarding Talamantes and Francisco, we are now hearing what the concern I have is that how do we not end up in a system where every time that a child's service worker makes a mistake in an application that they're not going to have a suit that, well, that's an incorrect statement, therefore it's a false statement. I think you could infer that it was intentional and, therefore, there isn't qualified immunity and they get sued. How do we not end up in that in this case? Well, this court has repeatedly given the test under which such a case is brought. In this case, there are multiple issues regarding misrepresentations and omissions. For example, and this is so critical, Your Honor, in this case, Brian Wright informed Talamantes and the police informed Talamantes that this child had had previous little boy bruises from roughhousing over the course of time and Brian informed Talamantes that the bruises, other than the one mark that was on the back of the leg that the parents informed Talamantes was caused by the two children play fighting with Hot Wheels tracks the night before. All of those other bruises were consistent with roughhousing, which was consistent with the police finding. And so this was all known and this was concealed. Now, Your Honor, the Costanich case is addressed if a mistake is made, then it's not actionable. But the Costanich case and in this particular case, Scanlon, line up exactly with misrepresentations which are actionable. It's for a jury to decide. Counsel, procedurally, this case came to us because there was a partial motion for summary judgment by plaintiffs and the district court granted qualified immunity to Dr. Woolridge. There was no affirmative motion for summary judgment on qualified immunity grounds by Dr. Woolridge, correct? That's correct. OK, so would there be an opportunity to raise a qualified immunity? I guess maybe this depends a little bit on how a ruling from this court might come down. But I'm curious to know sort of usually there are multiple points in time where a defendant who is seeking qualified immunity may assert that right. What would that look like in this case? Not in this case, Your Honor, because there's absolutely no dispute of genuine issue of material fact on that. This court is in the best position and this court should make that decision, I believe, because there is no sense in returning this for more of the same. All right. Thank you, Counsel. Thank you. The case just argued will be submitted.
judges: COLLINS, MENDOZA, DESAI